Jason Crews
1515 N Gilbert Rd Ste 107-204
Gilbert, AZ 85234
602-295-1875
Jason.crews@gmail.com

*In propria persona*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

PHOENIX DIVISION

| | |
|---|---|
| Jason Crews, | Case No.: 2:24-cv-00366-CDB |
| Plaintiff, | |
| vs. | **Second Amended** Complaint for Violations of: |
| First Family Insurance, LLC; | |
| First Family Insurance Agency, Inc; | 1.    NEGLIGENT VIOLATIONS OF THE TELEPHONE CONSUMER PROTECTION ACT [47 U.S.C. §227 ET SEQ.] |
| John Cosgriff; | |
| Ryan Anthony Lopez; | |
| And | |
| Kenneth Grushoff | 2.    WILLFUL VIOLATIONS OF THE TELEPHONE CONSUMER PROTECTION ACT [47 U.S.C. §227 ET SEQ.] |
| Defendants. | |

DEMAND FOR JURY TRIAL

*///*

COMPLAINT- 1

# COMPLAINT

## Preliminary Statement

1. "When it comes to robocalls, you can only call those who, like Blondie, have said, 'Call me. Call me on the line.' If you call people who haven't opted in, then you face liability under the Telephone Communications Protection Act." *Perrong v. Bradford*, 2024 WL 2133801, at *1 (E.D. Pa. May 13, 2024).

2. Plaintiff Jason Crews ("Plaintiff") brings this action under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C § 227, a federal statute enacted in response to widespread public outrage about the proliferation of intrusive, nuisance calling practices. See *Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 745 (2012).

3. The Defendants in this action orchestrated the placing, within a 12-month period, of at least twelve (12) illegal telemarketing calls using an Automated Telephone Dialing System ("ATDS") to a number assigned to a cellular service that was included on the National Do Not Call Registry.

4. Plaintiff never consented to receive such messages.

## Parties

5. Plaintiff Jason Crews ("Crews") is and was a resident of Maricopa County, Arizona at all relevant times and a resident of this District.

6. Defendant First Family Insurance, LLC ("FFI"), incorporated in Florida, is in the business of brokering health insurance, life insurance, and medical savings plans to the public[1].

7. Defendant First Family Insurance Agency, INC ("FFI Agency"), incorporated in Florida, is in the business of brokering health insurance, life insurance, and medical savings plans to the public on behalf of FFI.

8. Defendant John Cosgriff ("Cosgriff"), a resident of Minnesota, was, at all relevant times, the CEO of FFI who directed and authorized the illegal calls complained of herein.

---

[1] https://archive.ph/mYiCI

COMPLAINT- 2

9. Defendant Kenneth Grushoff ("Grushoff"), a resident of Florida, was, at all relevant times, the President of FFI Agency who, at the behest of Cosgriff, directed and authorized the illegal calls complained of herein.

10. Defendant Ryan Anthony Lopez ("Lopez"), a resident of Florida, was, at all times relevant, an employee of Defendants FFI and John Cosgriff and placed at least one of the illegal calls complained of herein.

## Jurisdiction

11. The Court has federal question subject matter jurisdiction over these TCPA claims: *Mims v. Arrow Fin. Services, LLC*, 132 S. Ct. 740 (2012). The Court has specific personal jurisdiction over Defendants because Defendants caused the events complained of herein to occur in Arizona; the TCPA claims arose from these events. Defendants had minimum contacts with Arizona to justify the assertion by an Arizona court of personal jurisdiction, *Meyers v. Hamilton Corp.*, 693 P.2d 904 (Ariz. 1985). Defendants intentionally called or caused Plaintiff's number to be called by dialing an Arizona area code at least 11 times within a 12- month period to advertise their services, despite Plaintiff's number being listed on the National Do Not Call Registry. Thus, these calls violated the TCPA. During one of these calls, Defendants confirmed Plaintiff's residence in Arizona, Exhibit 1 Page 1 ¶¶11, 15, Page 2,¶16; Page 3 ¶16, 23; Page 7 ¶10, stated they would be connected with "with a licensed agent from your state", Id. Page 2 ¶20-25and provided a copy of Lopez's Arizona license (Exhibit 2) to sell insurance in Arizona.

## Venue

12. The venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District, as the calls to Plaintiff were placed into this District.

## The Telephone Consumer Protection Act

8. In 1991, Congress enacted the TCPA to regulate the explosive growth of the automated calling industry. In so doing, Congress recognized that "[u]nrestricted

telemarketing . . . can be an intrusive invasion of privacy[.]": Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, § 2(5) (1991) (codified at 47 U.S.C. § 227).

9.    Under the TCPA, an individual such as Cosgriff may be personally liable for the acts alleged in this Complaint pursuant to 47 U.S.C. § 217 of the TCPA, which reads, inter alia:

> [T]he act, omission, or failure of any officer, agent, or other person acting for or employed by any common carrier or user, acting within the scope of his employment, Case 2:22-cv-02724-ER Document 1 Filed 07/11/22 Page 2 of 11 3 shall in every case be also deemed to be the act, omission, or failure of such carrier or user as well as of that person. 47 U.S.C. § 217 (emphasis added).

10.    In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 27 FCC Rcd. 1830, 1844 ¶ 33 (2012) (footnote and internal quotation marks omitted). FCC regulations "generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

11.    The FCC confirmed this principle in 2013 when it explained that "a seller … may be held vicariously liable under federal common law principles of agency for violations of either 5 section 227(b) or section 227(c) that are committed by third-party telemarketers." In the Matter of the Joint Petition Filed by Dish Network, LLC, 28 FCC Rcd. 6574, 6574 ¶ 1 (2013). 22. Under the TCPA, a text message is a call. *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951 – 52 (9th Cir. 2009).

12.    When considering individual liability under the TCPA, other courts have agreed that an officer or individual involved in the telemarketing at issue may be personally liable under the TCPA. See, e.g., *Jackson Five Star Catering, Inc. v. Beason*, 2013 U.S. Dist. LEXIS 159985, *10 (E.D. Mich. Nov. 8, 2013) ("[M]any courts have held that corporate actors can be individually liable for violating the TCPA where they had direct, personal participation in or personally authorized the conduct found to have violated the statute.") (cleaned up) and *Maryland v. Universal Elections*, 787 F. Supp. 2d 408, 415-16 (D. Md. 2011) ("If an individual

COMPLAINT- 4

acting on behalf of a corporation could avoid individual liability, the TCPA would lose much of its force.").

13.    Cosgriff is "Chief Executive Officer of UnitedHealthOne, the individual, family, and **distribution** line of business within UnitedHealthcare." (emphasis added) Exhibit 3

14.    Cosgriff is the CEO of numerous companies, Exhibit 4, facing numerous allegations of TCPA violations Exhibit 5.

15.    Cosgriff is the only common denominator between these companies and the pattern of violative telephone calls.

16.    Cosgriff personally participated in the complained-of actions by personally directing and authorizing the scripting and selecting of calls to be made, selecting and orchestrating the calling strategy, including choosing and approving the use of ATDSs, and personally selecting and approving all third parties who placed calls on Defendants' behalf advertising Defendants' products and services, essential activities, and FFI's primary distribution operations.

## **Factual Allegations**

17.    To promote their services, Defendants relied on the use of ATDSs.

18.    Plaintiff had no prior business relationship with Defendants.

19.    Plaintiff is a "person" as defined by 47 U.S.C. § 153(39).

20.    Defendant Cosgriff is a "person" as defined by 47 U.S.C. § 153(39).

21.    Defendant FFI is a "person" as defined by 47 U.S.C. § 153(39).

22.    The phone number (602) 295-XXXX ("Cell Number") belongs to Plaintiff.

23.    The Cell Number is assigned to a cellular phone used exclusively for personal residential purposes.

24.    Plaintiff did not consent to receive telephone calls via ATDS.

25.    The Cell Number is not associated with a business.

Calls to Plaintiff

26.    On or about December 9, 2023, at 9:22 am, Plaintiff was interrupted while working by a call presenting caller ID (602)452-9702.

COMPLAINT- 5

27. After answering, Plaintiff said hello multiple times, heard a beep, and then began recording the call.

28. Plaintiff was greeted by an individual purported marketplace health insurance plans. Exhibit 1, ¶¶ 7-11.,

29. Having previously received numerous similar calls in which the caller would not identify the true identity of the party on whose behalf they were calling, Plaintiff played along with the hopes of ascertaining their identity and asking them to stop calling.

30. Numerous times, the caller said he was attempting to transfer Plaintiff to a licensed agent in his area.

31. Eventually, Plaintiff disconnected the call rather than waste more time on the phone with the telemarketer.

32. On or about December 9, 2023, at 9:38 am, Plaintiff was interrupted while working by a phone call presenting caller ID (860) 517-4558.

33. After answering, Plaintiff said hello multiple times, heard a beep, and then began recording the call.

34. The individual identified themselves as Brian.

35. Despite the different caller ID, Plaintiff believed this to be the same individual who had called at 9:22 am that day because the individual complained about Plaintiff disconnecting the call.

36. Once again, Plaintiff played along to ascertain the identity of the caller and the company he represented.

37. The caller confirmed Plaintiff's ZIP code, 85233 (an Arizona zip code), at least three times, then said, "We are going to connect you with a licensed agent from your state and your city, and they will provide you the zero-dollar benefits."

38. Brian eventually transferred Plaintiff to an individual who identified himself as Andrew, who, in turn, transferred Plaintiff to a "licensed agent in your area."

39. That agent identified themselves as Ryan Anthony Lopez ("Lopez") from "First Family Insurance."

COMPLAINT- 6

40. Lopez confirmed Plaintiff lived in Arizona.

41. Lopez stated that he worked for First Family Insurance (Exhibit ? ¶ ??).

42. Upon information and belief, First Family Insurance is Defendant FFI.

43. Once Plaintiff believed he had established the identity of the callers, he requested that Lopez place him on their internal do-not-call list and send him a copy of their internal do-not-call policies.

44. Plaintiff did not receive a copy of the internal do-not-call policy ("DNC Policy") from Defendants.

45. Plaintiff avers and therefore believes this is because no such DNC Policy exists.

46. If any DNC Policy exists, Plaintiff avers and therefore believes Defendants' employees and vendors were not trained in its existence and/or its usage.

47. On or about December 16, 2023, Plaintiff sent an email to Defendant FFI requesting any evidence of consent in their possession to be placed on their internal do-not-call list and again requested a copy of their DNC Policy.

48. Defendants did not respond.

49. This is because Plaintiff did not consent.

50. Plaintiff avers and therefore believes this is because no such DNC Policy exists.

51. Despite Plaintiff's clear request to not be called, FFI called at least 10 additional times from the same caller ID.

52. The Cell Number has been on the Do Not Call Registry continuously since November 7, 2006.

53. Despite this registration and request, Defendants placed the calls summarized in the following table.

| Date | Time | Caller ID | Line Called |
|------|------|-----------|-------------|
| 12/9/2023 | 9:22 am | (602)452-9702 | (602)295-7930 |
| 12/9/2023 | 9:38 am | (860)517-4558 | (602)295-1875 |
| 12/12/2023 | 10:49 am | (860)517-4558 | (602)295-7930 |
| 12/19/2023 | 8:32 am | (860)517-4558 | (602)295-7930 |
| 12/21/2023 | 3:58 am | (860)517-4558 | (602)295-7930 |
| 12/28/2023 | 10:51 am | (860)517-4558 | (602)295-7930 |
| 12/28/2023 | 10:58 am | (860)517-4558 | (602)295-7930 |

COMPLAINT- 7

| 12/28/2023 | 12:35 am | (860)517-4558 | (602)295-7930 |
| 12/28/2023 | 2:33 pm  | (860)517-4558 | (602)295-7930 |
| 1/2/2024   | 1:38 pm  | (860)517-4558 | (602)295-7930 |
| 1/2/2024   | 1:39 pm  | (860)517-4558 | (602)295-7930 |
| 1/16/2024  | 3:24 pm  | (860)517-4558 | (602)295-7930 |

54.  On or about December 9, 2023, Plaintiff sent an investigation letter ("First Email") to RLOPEZ.24@yahoo.com, rlopez4insurance@gmail.com, and service@firstfamilyins.com Exhibit 6.

55.  Later that same day, Plaintiff received an automated message indicating that Plaintiff's email was undeliverable to service@firstfamilyins.com.

56.  On or about December 9, 2023, Plaintiff resent an investigation letter to RLOPEZ.24@yahoo.com, rlopez4insurance@gmail.com, and mLaughlin@firstfamilyinsurance.com "Second Email," Exhibit 6

57.  Both Rlopez.24@yahoo.com and rlopez4insurance@gmail.com are associated with Lopez.

58.  mLaughlin@firstfamilyinsurance.com ("Laughlin's Email") is associated with Michael Laughlin, CEO of "First Family Coral Springs."

59.  Plaintiff's Second Email was opened on or about December 9 at 12:17 pm. Exhibit 7

60.  Plaintiff's Second Email was first opened on or about December 9 at 1:12 pm Exhibit 7.

61.  Plaintiff's Second Email was first opened by someone with access to rlopez4insurance@gmail.com on or about December 9 at 1:12 pm Exhibit 7.

62.  Plaintiff's Second Email asked for Plaintiff to be placed on Defendant's internal do-not-call list.

63.  Plaintiff's Second Email asked for Plaintiff to be sent a copy of Defendant's internal do-not-call policy.

64.  Plaintiff's Second Email asked for Plaintiff to be sent any evidence of consent to receive telemarketing calls.

COMPLAINT- 8

65. Plaintiff's Second Email asked for Plaintiff to be sent any evidence of consent to receive calls utilizing an ATDS.

66. Despite Plaintiff's requests, Defendants did not respond to any of Plaintiff's emails.

67. Defendants did not add Plaintiff to Defendant's internal do-not-call list.

68. Plaintiff avers and therefore alleges this is because no such internal do-not-call list exists or Defendants and Defendant's employees and agents are not trained in its existence.

69. Defendants did not provide Plaintiff with a copy of Defendant's internal do-not-call policy.

70. Plaintiff avers and therefore alleges this is because no such internal do-not-call policy exists.

71. Defendants did not provide evidence of Plaintiff's consent to be called in any manner or for any reason.

72. This is because no such evidence of Plaintiff's consent exists.

## Defendants' Use of an ATDS

73. FFI called frequently and from various numbers.

74. FFI's representatives used identical or nearly identical scripts.

75. FFI's representatives purposefully attempted to conceal the identity of their company. Exhibit 2.

76. Plaintiff heard silence and was forced to say hello multiple times while waiting to be connected to Defendant's representatives.

77. When answering, Plaintiff heard a "bloop" before being connected to Defendant's representatives.

78. For these reasons, Plaintiff believes Defendant's telemarketers used an ATDS to generate leads for Defendants' insurance products and services.

79. The calls were conducted using an Automatic Telephone Dialing System (ATDS). As the Supreme Court recently clarified, the key feature of an ATDS is the capacity

COMPLAINT- 9

to store numbers to be called using a random or sequential number generator or to produce numbers to be called using a random or sequential number generator: *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163, 1167 (2021).

80.  The Third Circuit recently clarified that "Congress envisioned a broad understanding of 'equipment'" that constitutes an ATDS. It also clarified that the analysis of whether an ATDS was used in violation of the TCPA centers around "whether the Defendants employ[s] [ATDS] capacities to make automated calls": *Panzarella v. Navient Sols., Inc.*, 37 F.4th 867, 873, 878 (3d Cir. 2022). In so doing, it held that Congress intended to "ban all autodialed calls" because Congress "found autodialer technology to be uniquely harmful": Id. at 879 (cleaned up).

81.  In enacting the ATDS prohibition, the Third Circuit cited favorably to Congressional understanding "that telemarketers could transform ordinary computers into autodialers through minor and inexpensive modifications," including by "relying on computerized databases containing telephone numbers during their dialing campaigns": Id. at 880 (cleaned up). The Third Circuit held that, in passing the TCPA's ATDS prohibition, Congress intended to remedy the problems caused by callers using computer software to dial numbers randomly or sequentially from a list or database: *Id.*

82.  The system(s) that Defendants used to place the calls to Plaintiff is/are an ATDS because it would be illogical to dial a number manually, have Plaintiff answer the phone, and only then connect Plaintiff to a human being.

83.  Audible pauses, clicks, and beeps are hallmark indicia of ATDS systems. This supports the inference that Defendants used an ATDS, such as one that "use[s] a random [or sequential] number generator to determine the order in which to pick phone numbers from a pre-produced list": *Facebook*, 141 S. Ct. at 1171 n.7.

84.  Other courts have held, post-Facebook, that allegations similar to those herein of the absence of a relationship between the parties, and the random nature of the automation device (such as the ability to randomly generate caller ID numbers), are all indicia of use of a random or sequential dialing device. This gives rise to the inference at the pleadings stage

COMPLAINT- 10

that an ATDS was used to make the calls: *Camunas v. Nat'l Republican Senatorial Comm.*, No. 21-1005, 2021 U.S. Dist. LEXIS 100125 at *11 (E.D. Pa. May 26, 2021).

85.  No facts exist here to support the conclusion that Defendant was calling from a curated list of his past customers. In contrast to a company that dials calls en masse to multiple individuals from a list of telephone numbers (as here), a company that calls its existing customers utilizing an imported customer list does not place calls using an ATDS. Such calling uses a database targeting existing customers' information rather than computer-generated tables or lists of individuals to be called: *Panzarella*, 37 F.4th at 881–882.

86.  Plaintiff is ignorant of the exact process by which the system(s) used by Defendants operates other than by drawing the reasonable inference and alleging that the system(s) stores or produces telephone numbers randomly or possibly sequentially based on the facts ascertainable from the calls Plaintiff received, as outlined above. Indeed, as at least one district court explained, "The newly clarified definition of an ATDS is more relevant to a summary judgment motion than at the pleading stage": *Gross v. GG Homes, Inc.*, No. 3:21-cv-00271-DMS-BGS, 2021 WL 2863623, at *7 (S.D. Cal. July 8, 2021); accord *Miles v. Medicredit, Inc.*, No. 4:20-cv- 01186-JAR, 2021 WL 2949565 (E.D. Mo. July 14, 2021).

87.  For all of these reasons, Plaintiff avers and therefore alleges Defendant's calls were placed using a a random or sequential number generator.

**Defendants' Conduct Was Knowing and Willing**

88.  Defendants intentionally called Plaintiff multiple times to advertise their services to Plaintiff.

89.  These calls were knowingly and intentionally made after multiple direct written and verbal requests from Plaintiff to be placed on their internal do-not-call list and to not be called by Defendant or their representatives.

90.  Defendants knew their actions were in violation of the TCPA and willfully continued their conduct by calling Plaintiff multiple times despite the registration of his number on the National Do Not Call Registry and direct request not to be called.

*///*

COMPLAINT- 11

### Cosgriff's Personal Liability

91.  Defendant Cosgriff personally participated in the calls at issue because Cosgriff personally directed the calls to be transmitted throughout the United States, including numbers with Arizona area codes, which he knew were likely to belong to individuals, such as Plaintiff, who reside there.

92.  Cosgriff is the principal officer of Defendant FFI.

93.  Cosgriff closely holds Defendant FFI and is intimately involved in all decision making and legal activities of Defendant FFI.

94.  Cosgriff made the decision to hire agents such as Defendant Lopez, who are licensed in Arizona, approved of training employees such as Lopez on the use of proprietary technology, and directed his employees to use the technology with the intention of breaking state and federal laws.

95.  Defendant Cosgriff has direct and personal involvement in and ultimate control over every aspect of Defendant FFI's wrongful conduct that violated the TCPA and/or directly controlled and authorized this conduct.

96.  Defendant Cosgriff, at all times relevant to this Complaint, acting alone or in concert with others, formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.

97.  There is a precedent holding corporate officers personally liable when they participate in the alleged actions: "If the officer directly participated in or authorized the statutory violation, even though acting on behalf of the corporation, he may be personally liable." See United States v Pollution Serv. Of Oswego, Inc., 763 F.2d 133, 134-135 (2nd Cir.1985). The "well-settled" tort rule provides that "when corporate officers directly participate in or authorized the commission of a wrongful act, even if the act is done on behalf of the corporation, they may be personally liable." General Motors Acceptance Corp. v. Bates, 954 F.2d 1081, 1085 (5th Cir. 1992). The Fifth Circuit has elaborated that "the thrust of the general [tort] rule is that the officer to be held personally liable must have some direct, personal participation in the tort, as where the defendant was the' guiding spirit'

behind the wrongful conduct….or the 'central figure' in the challenged corporate activity."
Mozingo v. Correct Mfg. Corp., 752 F.2d 168, 174 (5th Cirt. 1985) (Citing Escude Cruz v.
Ortho Pharmaceutical Corp., 619 F. 2d 902, 907 (1st Cir.1980)) (Citing Texas v. American
Blastfax, Inc., 164 F. Supp. 2d 892 (W.D. Tex. 2001) Quoting Texas v. American Blastfax:
"The Court finds the above principles applicable to the TCPA[,] that is, an officer may be
personally liable under the TCPA if he had direct, personal participation in or personally
authorized the conduct found to have violated the statute, and was not merely tangentially
involved. Individuals who directly (and here, knowingly and willfully) violate the TCPA
should not escape liability solely because they are corporate officers. As the State persuasive
argues, to hold otherwise would allow the individual defendants to simply dissolve Blastfax,
set-up [sic] a new shell corporation, and repeat their conduct. Congress surely did not intend
to permit such a result in passing the TCPA. To be clear, the Court finds Greg and Michael
Horne were the 'guiding spirits' an[d] the 'central figures' behind the TCPA violations. They
were the two persons who controlled all of Blastfax's day-to-day operations. They both had
direct, personal involvement in and ultimate control over every aspect of Blastfax's wrongful
conduct that violate the TCPA, and/or directly controlled and authorized this conduct. And
they did so with their eyes and pocketbooks wide open. After October 5, 2000, Greg and
Michael Horne had good reason to believe they were running a business that violated the
TCPA. On February 9, 2001, they knew they were. Yet they continued to direct their
company to send unsolicited intrastate fax advertisements. This is far more than a simple
derivative liability case. Accordingly, the Court *899 holds defendants Greg and Michael
Horne are jointly and severally liable with Defendant Blastfax, Inc., for all TCPA damages in
this lawsuit." Texas v. American Blastfax, Inc., 164 F. Supp. 2d 892 (W.D. Tex. 2001).

    98.   The same Court held that corporate officers were also personally liable for
DTPA violations; The State contends Greg and Michael Horne are personally liable for any
DTPA damages because they were solely responsible for the violating conduct…..For the
same reasons discussed in finding the individual defendants personally liable under the
TCPA, the Court agrees. See, e.g., Barclay v. Johnson, 686 S.W.2d 334, 336-37 (Tex. Civ.

App.-Houston [1ST Dist.] 1985, no writ) (finding personal liability for corporate officer in DTPA misrepresentation claim, based on general rule that "a corporate agent knowingly participating in a tortious of fraudulent act may be held individually liable, even though he performed the act as an agent for the corporation……Accordingly, the Court finds defendants American Blastfax, Inc., Greg Horne and Michael Horne are jointly and severally liable for $6,000 in damages for their violations of the DTPA." Texas v. American Blastfax, Inc., 164 F. Supp. 2d 892 (W.D. Tex. 2001).

99.  Defendant Cosgriff is the CEO of FFI; he controls the day-to-day operations of FFI and directs his employees, agents, salespersons, and solicitors to make TCPA-violating phone calls.

100. Defendant Cosgriff is not merely a bystander. He is the mastermind who schemed, planned, directed, initiated, and controlled illegal and fraudulent behavior.

101. Defendant Cosgriff is well aware his conduct violated the TCPA and refused to alter their behavior. Defendant Cosgriff is the principal director and officer of Defendant FFI and the only person with the power to make unlawful, fraudulent, and unethical behavior stop.

102. Defendant's calls harmed Plaintiff by causing the very harm that Congress sought to prevent: a "nuisance and invasion of privacy."

**Vicarious Liability**

103.   Defendant FFI, through their authorized representative Defendant Lopez, made multiple auto-dialed robocalls to Plaintiff.

104.   Lopez used software provided by FFI.

105.   Lopez used proprietary information and systems provided by Defendant FFI.

106.   FFI authorized Lopez to make the phone calls at issue here.

107.   FFI was aware of the phone calls being made by Lopez and accepted referrals from Lopez pursuant to the authorization that FFI provided to Lopez.

108.   FFI gave access to their proprietary systems and software to Defendant Lopez.

COMPLAINT- 14

109.   FFI hired an offshore telemarketer to make phone calls on their behalf. Lopez is the agent of FFI, and the offshore telemarketer is the subagent of FFI.

110.   The offshore telemarketer made the phone calls at the direction and control of FFI.

111.   FFI exercised interim control over whom and under what conditions referrals would be accepted.

112.   FFI has been aware of the TCPA-violating phone calls made by salespersons for years and has ratified the behavior by maintaining the salespeople responsible for the violations and continuing to accept referrals despite knowledge of the violations.

113.   Cosgrif has made telemarketing in violation of the TCPA a regular source of referrals in multiple organizations with which he is associated.

114.   A defendant may be held vicariously liable for Telephone Consumer Protection Act (TCPA) violations where the plaintiff establishes an agency relationship, as defined by federal common law, between the defendant and a third-party caller. Telephone Consumer Protection Act of 1991, § 3(a), 47 U.S.C.A. § 227(b)(2). *Gomez v. Campbell-Ewald Co.*, 768 F.3d 872, 11 (9th Cir. 2014)

## Ratification

115.   Plaintiff delivered DNC requests to FFI on December 9, 2023.

116.   FFI was informed verbally of Plaintiff's DNC request to their employee Defendant Lopez on December 9, 2023.

117.   FFI was fully aware of Plaintiff's desire to not be called and solicited for their services.

118.   On December 12, 19, 21, four times on December 28, twice on January 2, and on once on January 16, FFI, with full knowledge of Plaintiff's desire to not be called and solicited, continued to call Plaintiff to advertise their products.

119.   Defendant FFI consciously called Plaintiff with full awareness that the phone calls were violating the TCPA and that Plaintiff had delivered multiple DNC requests to Defendant FFI.

COMPLAINT- 15

120.  Defendant FFI consciously called Plaintiff with full awareness that they did not maintain an internal do-not-call policy as required by the TCPA and that Plaintiff had requested it.

121.  Defendant FFI consciously called Plaintiff with full awareness that they had not placed Plaintiff on their internal do-not-call list as required by the TCPA and that Plaintiff had requested it because they did not maintain one.

122.  Even when a party is not directly liable, it may nevertheless be vicariously liable "under federal common law principles of agency for TCPA violations committed by third-party telemarketers." *DISH Network*, 28 FCC Rcd. at 6584. These agency principles include "not only formal agency [or actual authority], but also . . . apparent authority and ratification." *Id.* ; see also *FDS Rest., Inc. v. All Plumbing, Inc.*, 241 A. 3d 222, 238n. 24 (D. C. 2020) (noting that a different provision of the TCPA, 47 U.S.C. § 217, creates vicarious liability for the acts of an agent). The plaintiff must establish the agency relationship between the defendant and the third-party caller to establish vicarious liability. See *Henderson v. United Student Aid Funds, Inc.*, 918 F.3d 1068, 1072-73 (9th Cir. 2019), as amended on denial of reh'g and reh'g en banc (May 6, 2019) (citing *Gomez v. Campbell-Ewald Co.* , 768 F.3d 871, 878 (9th Cir. 2014), aff'd, 577 U.S. 153 (2016), as revised (Feb. 9, 2016)).

**The TCPA Prohibits All Automated Calls to Protected Numbers**

123.  The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automated telephone dialing system or an artificial or prerecorded voice … to any telephone number assigned to a … paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the party is charged for the call": 47 U.S.C. § 227 (b)(1)(A)(iii).

124. Congress singled out these services for special protection because Congress realized their special importance in terms of consumer privacy (as is the case with cellular phones): *Barr v. Am. Ass'n of Pol. Consultants Inc.*, 140 S. Ct. 2335, 2356, (2020) (Gorsuch, J. & Thomas, concurring in part and dissenting in part).

COMPLAINT- 16

125.  According to findings by the Federal Communications Commission ("FCC"), which is the agency Congress vested with the authority to issue regulations implementing the TCPA, such messages are prohibited because, as Congress found, automated or prerecorded messages are a greater nuisance and invasion of privacy than live ones, are costly, and are inconvenient.

126. The TCPA provides a private cause of action to persons who receive calls in violation of 47 U.S.C. § 227(b)(1)(A). 47 U.S.C. § 227(b)(1)(3).

127. These causes of action apply to users of any of four protected services (pager, cellular, specialized mobile radio [i.e., radio telephony locator beacon or dispatch system], or another radio common carrier service [i.e., ship-to-shore or air-to-ground]), or any service, including residential, VoIP, and landline services, for which the called party is charged: *Lynn, Monarch Recovery Mgmt. Inc.*, 953 F. Supp. 2d 612, 623, (D. Md. 2013).

128. "Non-Emergency pre-recorded voice or autodialed calls to the destinations enumerated in 47 U.S.C. § 227(b)(1)(A) are permissible only with the prior express consent of the called party."

129. U.S.C. § 227(c)(2) states, "No person or entity shall initiate any telephone solicitation to … [a] residential telephone subscriber who has registered his or her telephone number on the National Do Not Call Registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government" and defines "telephone solicitation" as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person…": U.S.C. § 227(f)(15).

130. The FCC also recognized that "wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used": In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991, CG Docket No. 02-278, Report and Order, 18 FCC Rcd. 14014, 14115, ¶ 165 (2003).

COMPLAINT- 17

131. In 2013, the FCC required prior express written consent for all autodialed or prerecorded telemarketing calls ("robocalls") to wireless numbers and residential lines. Specifically, it ordered:

> [A] Consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer: (1) received "clear and conspicuous disclosure" of the consequences of providing the requested consent, i.e., that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates. In addition, the written agreement must be obtained "without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service."

132. *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 FCC Rcd. 1830, 1844 (2012) (footnotes omitted).

133. 47 C.F.R. § 64.1200 extends 47 U.S.C. § 227 and establishes several delivery restrictions. It states, "No person or entity may … [e]xcept as provided … initiate any telephone call … using an automatic telephone dialing system or an artificial or prerecorded voice."

134. 47 C.F.R. § 64.1200(a)(1) specifically protects the following: "emergency telephone line," "guest room or patient room of a hospital, health care facility, elderly home, or similar establishment," and/or "cellular telephone service." 47 C.F.R. § 64.1200(a)(2) further prohibits entities from "initiat[ing], or caus[ing]to be initiated, any telephone call that includes or introduces an advertisement or constitutes telemarketing, using an automatic telephone dialing system or an artificial or prerecorded voice, to any of the lines or telephone numbers described…"

135. The National Do Not Call Registry allows consumers to register their telephone numbers and thereby indicate their desire to not receive telephone solicitations at those numbers: 47 C.F.R. § 64.1200(c)(2).

136. A listing on the registry "must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator": *Id.*

COMPLAINT- 18

137. The TCPA and implementing regulations prohibit the initiation of telephone solicitations to residential telephone subscribers whose numbers are on the registry and provide a private right of action against any entity making those calls or "on whose behalf" such calls are promoted: 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(c)(2).

138. 47 C.F.R. § 64.1200(d) states, "No person or entity shall initiate any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity." It goes on to establish specific "minimum standards":

(1) "Persons or entities making calls for telemarketing purposes must have a written policy, available upon demand…"
(2) "[P]ersonnel engaged in any aspect of telemarketing must be informed and trained in the existence and use of the do-not-call list."
(3) "If a person or entity making a call for telemarketing purposes … receives a request … not to receive calls from that person or entity, the person or entity must record the request and place the subscriber's name … and telephone number on the do-not-call list at the time the request is made … must honor a residential subscriber's do-not-call request within a reasonable time from the date such request is made."
(4) "A person or entity making a call for telemarketing purposes must provide the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted."
(5) "A person or entity making calls for telemarketing purposes must maintain a record of a consumer's request not to receive further telemarketing calls."

### Claims

### Count One

139.    Plaintiff incorporates the foregoing allegations as fully set forth herein.

140.    The foregoing acts and omissions of Defendants and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf constitute violations of the TCPA, 47 U.S.C. § 227, by sending calls, except for emergency purposes, to Plaintiff's telephone, which is assigned to a cellular telephone service, using an ATDS.

141.    As a result of their unlawful conduct, Defendants invaded Plaintiff's personal privacy, causing Plaintiff to suffer damages and, under 47 U.S.C. § 227(b)(3)(B), entitling him to recover $500 in civil fines for each violation and an injunction requiring Defendants to stop their illegal calling campaign.

142.    Plaintiff is also entitled to and does seek injunctive relief prohibiting Defendants and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf from violating the TCPA, 47 U.S.C. § 227, by making calls or sending messages, except for emergency purposes, to any number using an artificial or prerecorded voice in the future.

143.    Plaintiff is entitled to an award of up to $1500 in damages for each knowing and willful violation of 47 U.S.C. § 227(b)(3)(B).

144.    Defendants' violations were willful and/or knowing.

## Count Two

145.    Plaintiff incorporates the foregoing allegations as fully set forth herein.

146.    Defendants called Plaintiff's private residential telephone number, which was registered on the National Do Not Call Registry more than thirty-one (31) days prior to the calls, in violation of 47 U.S.C. § 227(c)(3)(F) and 47 C.F.R. § 64.1200(c)(2).

147.    As a result of their unlawful conduct, Defendants invaded Plaintiff's personal privacy, causing Plaintiff to suffer damages and, under 47 U.S.C. § 227(c)(3)(F), entitling him to recover $500 in civil fines for each violation and an injunction requiring Defendants to stop their illegal calling campaign.

148.    Plaintiff is entitled to an award of up to $1500 in damages for each knowing and willful violation of 47 U.S.C. § 227(c)(3)(F).

149.    Defendants' violations were willful and/or knowing.

## Count Three

## Violation of the Florida Telephone Solicitation Act,

## Fla. Stat. § 501.05

150.    Plaintiff incorporates the foregoing allegations as fully set forth herein.

COMPLAINT- 20

151.    It is a violation of the FTSA to "make or knowingly allow a telephonic sales call to be made if such call involves an automated system for the selection or dialing of telephone numbers or the playing of a recorded message when a connection is completed to a number called without the prior express written consent of the called party." Fla. Stat. § 501.059(8)(a).

152.    A "telephonic sales call" is defined as a "telephone call, text message, or voicemail transmission to a consumer for the purpose of soliciting a sale of any consumer goods or services, soliciting an extension of credit for consumer goods or services, or obtaining information that will or may be used for the direct solicitation of a sale of consumer goods or services or an extension of credit for such purposes." Fla. Stat. § 501.059(1)(i).

153.    Defendant failed to secure prior express written consent from Plaintiff.

154.    In violation of the FTSA, Defendant made and/or knowingly allowed telephonic sales calls to be made to Plaintiff without Plaintiff's prior express written consent.

155.    Defendant made and/or knowingly allowed the telephonic sales calls to Plaintiff to be made utilizing an automated system for the selection or dialing of telephone numbers.

As a result of Defendants' conduct, and pursuant to § 501.059(10)(a) of the FTSA, Plaintiff was harmed and is entitled to a minimum of $500 in damages for each violation. *Id.*

## **Relief Sought**

WHEREFORE, Plaintiff requests the following relief:

A. Injunctive relief prohibiting Defendants from calling telephone numbers using an artificial or prerecorded voice and/or ATDS.

B. Because of Defendants' violations of the TCPA, Plaintiff seeks for himself $500 in damages for each violation or—where such regulations were willfully or knowingly violated—up to $1,500 per violation, pursuant to 47 U.S.C. § 227(b)(3).

C. Because of Defendants' violations of the TCPA, Plaintiff seeks for himself $500 in damages for each violation or—where such regulations were willfully or

COMPLAINT- 21

knowingly violated—up to $1,500 per violation, pursuant to 47 U.S.C. § 227(c)(3).

D. Because of Defendants' violations of the FTSA, Plaintiff seeks for himself $500 in damages for each violation or—where such regulations were willfully or knowingly violated—up to $1,500 per violation, pursuant to Fla. Stat. § 501.059.

E. Such other relief as the Court deems just and proper. RESPECTFULLY SUBMITTED on this February 1, 2025.

/s/ *Jason Crews*

Jason Crews

COMPLAINT- 22

**Exhibit 1**

Phone Call with Jason Crews

Recording Name:
[phone_20231209-093806__18605174558]

Transcript Prepared By:



DITTO

720-287-3710
3801 E. Florida Ave.
Suite 500
Denver, CO 80210

DUNS Number: 037801851
CAGE Code: 6C7D5
Tax ID #: 27-2983097

1

2    Crews:      Hello?

3    Brian:      Uh, hi, sir, my name is Brian (ph).  How are you doing

4                today?  Yes, sir, my name is Brian.  How are you doing

5                today?

6    Crews:      Fine.

7    Brian:      Uh, great, sir.  Uh, the reason I'm giving you call to

8                inform that you qualify for like -- uh, you are

9                qualified for insurance in Marketplace (inaudible -

10               0:00:19).  Uh, your age is 41 and your zip code is

11               85233, right?

12   Crews:      Yeah, who is this?

13   Brian:      I am Brian, so you (inaudible - 0:00:32) to the

14               Marketplace.  Uh, (inaudible - 0:00:37) fill out your

15               application, and your zip code is 85233, right?

16   Crews:      Yeah.

17   Brian:      Thank you.  And you want the zero dollar plan for

18               yourself, right?

19   Crews:      Sure.

20   Brian:      Perfect.  Uh, which state your living at, sir, let me

21               check that?  Sir, what state you're living at?

22   Crews:      The only place where that zip code exists.

23   Brian:      Okay, let me check that.  Just clear with me that your

24               age is 41, right?  And when you sometimes go to the

25               doctor, do you pay any co-pays?

| | | |
|---|---|---|
| 1 | Crews: | I don't have insurance, so no. |
| 2 | Brian: | Perfect. |
| 3 | Andrew: | Can you hear me? |
| 4 | Crews: | I can hear you.  Can you hear me? |
| 5 | Andrew: | Hello? |
| 6 | Crews: | Hello? |
| 7 | Andrew: | Yes, I can, this is Andrew (ph).  And, uh, yeah.  This |
| 8 | | is Andrew.  We had a conversation a few minutes ago. |
| 9 | | So now -- |
| 10 | Crews: | Andrew?  You told me your name was Jason (ph) earlier. |
| 11 | Andrew: | Yeah, I'm the senior one here.  I'm the senior one |
| 12 | | here.  The Jason -- Jason is my, you know, junior |
| 13 | | assist here, and I'm the senior one on the floor, the |
| 14 | | senior supervisor here. |
| 15 | Crews: | Mm. |
| 16 | Andrew: | And I have your zip code in front of me.  It's 85233. |
| 17 | Crews: | Mm-hm. |
| 18 | Andrew: | And you're 41 years old. |
| 19 | Crews: | Yeah. |
| 20 | Andrew: | Okay, sounds good.  So now, you know, we are going to |
| 21 | | connect you with a licensed agent from your state and |
| 22 | | your city.  And they will provide you the zero dollar |
| 23 | | benefits to (inaudible - 0:02:24) subsidy.  Okay? |
| 24 | | When they are on the line, let them know that you want |
| 25 | | the zero dollar benefits for 2024. |

```
1    Crews:     Okay.
2    Andrew:    Okay?
3    Crews:     Okay.
4    Andrew:    Okay, that's great.  Just stay with me, I'm
5               transferring.  Okay, stay with me, I'm transferring
6               the call.
7    Ryan:      This is Ryan (ph), thank you for calling.
8    Crews:     Hello?  Hello?
9    Ryan:      Hi, are you looking for insurance today?
10   Crews:     Yeah.
11   Ryan:      Oh, can you hear me?
12   Crews:     Yeah.  Can you hear me?
13   Ryan:      Yes.  Are you looking for insurance today?
14   Crews:     Yeah.
15   Ryan:      Perfect.  What state are you calling from?
16   Crews:     Arizona.
17   Ryan:      Okay.  And what is your estimated household income for
18               2024?
19   Crews:     Mm, probably about $30,000.
20   Ryan:      Okay.  And what is your date of birth?
21   Crews:     June 23, '82.
22   Ryan:      And your zip code?
23   Crews:     85233.
24   Ryan:      Are you currently insured right now?
25   Crews:     No.
```



4

```
 1   Ryan:      Okay.  And just in case we get disconnected, what is
 2              the best phone number for you?
 3   Crews:     Uh, this number, which I just got, uh, let me see,
 4              602, um, what is it?  295.
 5   Ryan:      Okay.
 6   Crews:     7930.
 7   Ryan:      Okay, perfect, thank you.  And what was your budget
 8              for, uh, health coverage today?
 9   Crews:     I don't really know, I don't how much it costs.  No
10              idea.
11   Ryan:      Okay, perfect.  Um, when you do your taxes, do you
12              have any spouse or any dependents?
13   Crews:     No, it's just me.
14   Ryan:      Okay, no problem.  You said 6/23/1982, correct?
15   Crews:     Yeah.
16   Ryan:      Okay, perfect.  Okay, so I do have a plan with, uh,
17              United Healthcare on the Marketplace.  Uh, doctor
18              visits are $50 copay.  Specialist visits are $100
19              copay, and for any generic medications, a $25 copay,
20              okay?
21   Crews:     Okay.
22   Ryan:      Okay.  This is coming out to zero dollar monthly
23              premium, uh, because of your subsidy, uh, but it also
24              does have a health deductible.  Say something does
25              happen where you have to go to the hospital or
```

|  |  |  |
|---|---|---|
| 1 |  | something like that, uh, is a $7500 deductible, but |
| 2 |  | your max out of pocket is $9400 -- 94 -- $9400 per |
| 3 |  | year.  That's the max you could pay on this plan if |
| 4 |  | something, you know, say like catastrophic happens. |
| 5 | Crews: | Okay. |
| 6 | Ryan: | Okay.  So it is zero dollars a month.  Uh, again, put |
| 7 |  | plan enhancements on there to cover your deductible |
| 8 |  | and max out of pocket, but that is up to you. |
| 9 | Crews: | Okay.  Um, how's all that work?  What -- who's this -- |
| 10 |  | who's this through? |
| 11 | Ryan: | United Healthcare. |
| 12 | Crews: | Okay.  Um, okay.  Um, yeah, no, that sounds -- |
| 13 | Ryan: | Like I -- |
| 14 | Crews: | -- sound in- -- |
| 15 | Ryan: | -- like I do have plans where, you know -- |
| 16 | Crews: | Go ahead. |
| 17 | Ryan: | Go ahead. |
| 18 | Crews: | Uh, I was just gonna say like, um -- |
| 19 | Ryan: | Were you also interested in, um, dental and vision as |
| 20 |  | well? |
| 21 | Crews: | I mean how much does all that cost? |
| 22 | Ryan: | I can pull up a quote for you right now, one second. |
| 23 |  | Let me see here, some kind -- okay.  All right, |
| 24 |  | perfect.  So for your dental and vision, uh, which |
| 25 |  | your preventive care, which is like your x-rays and |

|     |        |                                                            |
|-----|--------|------------------------------------------------------------|
| 1   |        | your cleaning, zero cost to you starting from day one,     |
| 2   |        | okay.  For any basic services, which is like your          |
| 3   |        | fillings, extractions, the plan is gonna pay up to 80%     |
| 4   |        | of cost.  Any -- any major services, like your crowns,     |
| 5   |        | root canals, oral surgeries, things like that, it's        |
| 6   |        | gonna cover up to 50%.                                      |
| 7   | Crews: | Okay.                                                      |
| 8   | Ryan:  | So for -- and as for your vision, vision is a $10          |
| 9   |        | copay whenever you go to the do- -- uh, eye doctor.        |
| 10  |        | Uh, $10 copay for contacts, and United also gives you      |
| 11  |        | a $150 allowance towards your frames every year.           |
| 12  | Crews: | Okay.  And that's all through United?                      |
| 13  | Ryan:  | This is all through United, correct.                       |
| 14  | Crews: | Okay.  Okay.  Um --                                        |
| 15  | Ryan:  | All right, and --                                          |
| 16  | Crews: | Go ahead.                                                  |
| 17  | Ryan:  | -- so for your dental, medical, and vision, it's          |
| 18  |        | coming out to $58.87 a month.                             |
| 19  | Crews: | $58.87, okay.  That's not too bad.  Um, so, do you        |
| 20  |        | have any way that I can just verify who I'm talking        |
| 21  |        | to?  I'm just trying to be careful 'cause I got            |
| 22  |        | scammed a while back.                                      |
| 23  | Ryan:  | Sure.  Okay, verify.  So what I can do is I can           |
| 24  |        | actually send you -- hold on one second.  I'm gonna       |
| 25  |        | send you from my direct, uh, my direct line, I'm going    |

| | | |
|---|---|---|
| 1 | | to send you my business card and my NPN number.  And |
| 2 | | if you like, I can send you, uh, via email my, uh, |
| 3 | | State license to sell you insurance in your state, if |
| 4 | | you like. |
| 5 | Crews: | Yeah, sure, that would make me feel better. |
| 6 | Ryan: | Yeah, not a problem.  Give me one second.  Okay, so I |
| 7 | | just sent you over my business card, my national |
| 8 | | producer number, I'm gonna send that right now. |
| 9 | Crews: | Okay, got it. |
| 10 | Ryan: | And you said Arizona, correct? |
| 11 | Crews: | Yeah. |
| 12 | Ryan: | Uh, if you like I'll just send you a picture if you |
| 13 | | like. |
| 14 | Crews: | All right. |
| 15 | Ryan: | Yeah, a screen -- screenshot from my -- my, uh -- |
| 16 | Crews: | Sure.  So is that your -- that's weird, it's -- it's |
| 17 | | got like a -- are you like an independent agent then? |
| 18 | Ryan: | Yes, so I have -- I have access to all carriers, so |
| 19 | | I'm not just United.  I also, uh, have everything on |
| 20 | | the Marketplace as well.  So, what I just quoted you |
| 21 | | was on the Marketplace.  I could put, uh, I could put |
| 22 | | you on a -- a PPO plan, strictly through United.  But, |
| 23 | | you know, obviously it is a little, you know, a little |
| 24 | | more pricier.  So it's -- it's fairly (inaudible - |
| 25 | | 0:12:45).  Um, that's why I always ask what your -- |

| 1 | | your budget is for your insurance. |
|---|---|---|

1           your budget is for your insurance.
2  Crews:   Yeah.  Yeah, I guess I'm just a little, um, a little -
3           - just a little -- sorry, I'm just trying to be
4           cautious.  Like I said I got scammed.  The Gmail
5           address kind of throws me, 'cause usually it's like a
6           company email, you know.
7  Ryan:    No, not a problem.
8  Crews:   So you don't -- so you -- you -- you're an
9           independent?  You like --
10 Ryan:    And, uh, so, uh --
11 Crews:   -- you don't have a company?
12 Ryan:    -- I work -- yeah, I work for a fam- -- family
13          insurance.
14 Crews:   I'm sorry, you said family insurance?
15 Ryan:    I work through First Family Insurance.
16 Crews:   Oh, First --
17 Ryan:    But we're all independent, we're brokers.  First
18          Family Insurance, yes.  You can look -- look them up
19          as well.
20 Crews:   Okay, maybe I'll do that real quick here.  First
21          Family Insurance dot com?  Is that it, First Family
22          insurance --
23 Ryan:    Yes.
24 Crews:   -- dot com?  Okay.  Okay, insurance plans.  First
25          Family Insurance, okay.  It's the one that's based out



|   |   |   |
|---|---|---|
| 1 | | of Florida, Fort Myers, Florida?  Is that the right |
| 2 | | one? |
| 3 | Ryan: | Yes, we have multiple, um, multiple offices at -- |
| 4 | | yeah.  So yeah, we have Fort Myers, we also have Coral |
| 5 | | Springs, which is the one I'm in.  We also have one in |
| 6 | | Chicago as well. |
| 7 | Crews: | Oh, where's Coral Springs, is that in Florida too? |
| 8 | | Okay. |
| 9 | Ryan: | Yeah, it's also in Florida, yeah.  More down south, |
| 10 | | like towards like Miami area.  You know, roughly an |
| 11 | | hour away from Miami. |
| 12 | Crews: | Oh, okay.  Okay, great.  Thank you.  Now I've got |
| 13 | | everything.  I think I -- I can figure it out.  Um, |
| 14 | | okay.  Yeah, so can you go ahead and put me on your Do |
| 15 | | Not Call list please, and then send me a copy of your |
| 16 | | internal Do Not Call policies. |
| 17 | Ryan: | Oh, wow, I thought you -- you wanted insurance.  I was |
| 18 | | just trying to be helpful. |
| 19 | Crews: | I know, but I keep getting telephone calls from people |
| 20 | | like you, and they won't stop calling. |
| 21 | Ryan: | Hello? |
| 22 | Crews: | So, yeah, so I just -- I just want the calls to stop |
| 23 | | please. |
| 24 | Ryan: | Okay, yeah, that's not a problem.  Yeah, okay, that's |
| 25 | | not a problem.  I, you know, I didn't want to waste |

|     |        |                                                              |
| --- | ------ | ------------------------------------------------------------ |
| 1   |        | your time.  That's why if you said no, I would have          |
| 2   |        | just hung up.                                                |
| 3   | Crews: | I know, but if you just hang up, I can't figure out          |
| 4   |        | who you are to figure out -- so I can keep track of it       |
| 5   |        | when somebody calls me back.  So --                          |
| 6   | Ryan:  | Oh, okay.  So -- yeah, okay, yeah, you got it.  So I'm       |
| 7   |        | just letting you know, these numbers aren't coming           |
| 8   |        | from us.  Uh, these numbers are just like coming from        |
| 9   |        | like a call bank.  So --                                     |
| 10  | Crews: | Who -- who's the call --                                      |
| 11  | Ryan:  | -- it's not like my fault that, you know, I'm getting        |
| 12  |        | an inbound call from -- that's what I'm telling you.         |
| 13  | Crews: | Who's -- who's -- who's making phone calls?                  |
| 14  | Ryan:  | I'm not sure.  It's -- it's -- it's through -- it's          |
| 15  |        | through, um, whoever -- whoever takes it -- it's just        |
| 16  |        | automated, like we get the incoming calls.  We're not       |
| 17  |        | physically dialing you.                                      |
| 18  | Crews: | Right.  But -- okay.  All right, no, that's fine.  All       |
| 19  |        | right, thank you.                                            |

1                    TRANSCRIBER'S CERTIFICATE

2

3           I, Kimela Biers, do hereby certify that I have

4     listened to the recording of the foregoing; further that the

5     foregoing transcript, Pages 1 through 10, was reduced to

6     typewritten form from a digital recording of the proceedings

7     held December 9, 2023 in this matter; and that the foregoing is

8     an accurate record of the proceedings as above transcribed in

9     this matter on the date set forth.

10          DATED this 23rd day of May, 2024.

11

12

13                          _____

14                          Kimela Biers

15                          Ditto Transcripts
                            3801 E. Florida Ave.
16                          Suite 500
                            Denver, CO 80210
17                          Tel: 720-287-3710
                            Fax: 720-952-9897
18

19                          DUNS Number: 037801851
                            CAGE Code: 6C7D5
20                          Tax ID #: 27-2983097

21

22

23

24

Exhibit 2



## Contact

www.linkedin.com/in/johnwcosgriff
(LinkedIn)
www.unitedhealthgroup.com
(Company)

## Certifications

Certified in Public Health

Certified Emergency Medical
Technician (inactive)

## Publications

Strengthening Benefits Awareness in
the C-suite

LifescienceAlley Conference
Panelist: Internet of Things (IoT) and
its Health Care Implications

Presentation: Fixing Healthcare

Presentation: Delivering Care at
Scale

Digital Health, Electronic Medical
Records and Interoperability
Analysis

# John Cosgriff

Chief Executive Officer at UnitedHealthOne
Greater Minneapolis-St. Paul Area

## Summary

John Cosgriff is Chief Executive Officer of UnitedHealthOne, the individual, family, and distribution line of business within UnitedHealthcare. UnitedHealthcare is part of UnitedHealth Group, the world's largest healthcare company, ranking number 5 on the Fortune 500, with revenues of over $372 billion and 456,000 employees serving over 145 million consumers. John's roles at UnitedHealthcare have spanned its Commercial, Medicare, and Medicaid businesses, including leading strategy and business development across UnitedHealthcare from 2017-2022, completing over 50 transactions during that period.

Prior to UnitedHealth Group John was part of Accenture's Financial Services practice, where his clients included Fortune 500 companies, nonprofits, and governments in the United States and Europe. He started his career on Capitol Hill in staff roles in the United States House of Representatives and the United States Senate.

John is a past Trustee for St. Paul Academy and Summit School, and for the Science Museum of Minnesota, and a mentor for Techstars, a national startup accelerator. He is also a personal investor in twenty privately held early stage technology companies, including AddStructure (acquired by Bazaarvoice/NASDAQ:BV), Blueprint Registry (acquired by David's Bridal), Enso (merged with Hinge Health), NineSixteen (acquired by Fyllo), People Clerk (acquired by QFJ), Branch, Hinge Health, QuSecure, HyperKelp, Orbit Fab, Seasats, Zeno Power, Renno, Modal Living, Equatorial Space, Worxbee, Deep Planet, Fenix Space, and WingXpand. John, his wife Theresa, and their children support scientific research, education, healthcare and humanitarian causes through The John and Theresa Cosgriff Charitable Fund, a 501(c)(3) nonprofit organization.

John holds an MBA from the University of Chicago and an MPH from the University of Minnesota.

———

## Experience

UnitedHealth Group
Chief Executive Officer at UnitedHealthOne
July 2005 - Present (18 years 11 months)

Chief Executive Officer at UnitedHealthOne, the individual, family, and distribution line of business within the $281 billion UnitedHealthcare organization.

- Chief Executive Officer at UnitedHealthOne (2022-Present)
- Chief Strategy Officer and SVP of Business Development at UnitedHealthcare (2017-2022)
- SVP of Strategy and New Ventures at UnitedHealthcare Medicare & Retirement (2015-2017)
- Chief of Staff at UnitedHealthcare Medicare & Retirement (2014-2015)
- Chief of Staff at UnitedHealthcare Community & State (2012-2014)
- Vice President of Corporate Development and Strategic Planning at UnitedHealthcare Community & State (2010-2012)
- Vice President of Marketing at UnitedHealthcare Community & State (2008-2010)
- Senior Director of Strategy and Operations at UnitedHealth Group (2007-2008)
- Director of Strategy and Operations at UnitedHealth Group (2005-2007)

Techstars
Mentor
May 2016 - Present (8 years 1 month)

Supporting entrepreneurs in Techstars' startup accelerator programs, including Techstars Retail Accelerator (in partnership with Target), Space Accelerator (in partnership with NASA's Jet Propulsion Laboratory (JPL), Lockheed Martin, SAIC, and the U.S. Air Force), Techstars Los Angeles Accelerator, and Techstars Healthcare Accelerator (in partnership with UnitedHealthcare).

WingXpand
Advisor and Investor
November 2022 - Present (1 year 7 months)

Fenix Space
Advisor and Investor
October 2022 - Present (1 year 8 months)

Deep Planet
Advisor and Investor
September 2022 - Present (1 year 9 months)

Worxbee
Advisor and Investor
July 2022 - Present (1 year 11 months)

Equatorial Space
Advisor and Investor
April 2022 - Present (2 years 2 months)

Zeno Power
Investor
September 2021 - Present (2 years 9 months)

Seasats
Advisor and Investor
August 2021 - Present (2 years 10 months)

Orbit Fab
Investor
July 2021 - Present (2 years 11 months)

HyperKelp, Inc.
Advisor and Investor
July 2021 - Present (2 years 11 months)

QuSecure
Advisor and Investor
July 2021 - Present (2 years 11 months)

Hinge Health
Investor
March 2021 - Present (3 years 3 months)

Enso (my 2017 investment) merged with Hinge Health in March 2021.

## Branch
Advisor and Investor
September 2016 - Present (7 years 9 months)

## People Clerk
Advisor and Investor
January 2022 - April 2024 (2 years 4 months)

People Clerk was acquired by QFJ in April 2024.

## Modal Living
Advisor and Investor
April 2022 - September 2023 (1 year 6 months)

## Renno
Advisor and Investor
September 2021 - March 2023 (1 year 7 months)

## NineSixteen
Advisor and Investor
October 2021 - June 2022 (9 months)

NineSixteen was acquired by Fyllo in June 2022.

## Enso
Advisor and Investor
March 2017 - March 2021 (4 years 1 month)

Enso merged with Hinge Health in March 2021.

## Blueprint Registry
Advisor and Investor
June 2016 - August 2018 (2 years 3 months)

Blueprint Registry was acquired by David's Bridal in August 2018.

## AddStructure
Advisor and Investor
June 2016 - February 2018 (1 year 9 months)

AddStructure was acquired by Bazaarvoice (NASDAQ: BV) in February 2018.

## Accenture
Manager
June 1997 - June 2003 (6 years 1 month)

Washington D.C. Metro Area

Served as a management and technology consultant to numerous Fortune 500 companies, non-profits, and government clients in the United States and Europe (assignments included Paris, Zurich and London). Accenture operated as Andersen Consulting until shortly before our IPO in 2001.

United States Senate
Staff
May 1994 - December 1995 (1 year 8 months)

United States House of Representatives
Intern
January 1994 - May 1994 (5 months)

---

## Education

The University of Chicago - Booth School of Business
MBA  · (2003 - 2005)

University of Minnesota School of Public Health
MPH  · (2013 - 2015)

The George Washington University - School of Business
BBA (Honors)  · (1993 - 1997)

# Exhibit 4

List of additional business entities believed to be associated with John Cosgriff.

- SMALL BUSINESS INSURANCE ADVISORS, INC
- GETHEALTHINSURANCE.COM AGENCY INC
- FIRST FAMILY INSURANCE, LLC
- GOLDEN OUTLOOK, INC.
- GOLDEN RULE INSURANCE COMPANY
- THE CHESAPEAKE LIFE INSURANCE COMPANY
- SMALL BUSINESS INSURANCE ADVISORS, INC.
- MID-WEST NATIONAL LIFE INSURANCE COMPANY OF TENNESSEE
- USHEALTH ADVISORS, LLC
- GETHEALTHINSURANCE.COM AGENCY INC.
- USHEALTH CAREER AGENCY, INC.

# Exhibit 5

List of cases in other courts alleging violations of the TCPA which are associated with Cosgriff.

- *Prosser v. US Health Advisors, LLC, et al.*, Missouri Middle District
- *Hirsch v. US Health Advisors, LLC*, Northern District Of Texas, Fort Worth Division
- *Muccio v. US Health Advisors LLC*, Florida Palm Beach Court System
- *Hobbs v. US Health Advisors LLC*, Florida Southern Court
- *Prosser v. US Health Advisors LLC*, Eastern District of Missouri

 Gmail                                                                    **Jason Crews <jason.crews@gmail.com>**

---

## (no subject)
3 messages

---

**Jason Crews** <jason.crews@gmail.com>                                    Sat, Dec 9, 2023 at 11:00 AM
To: RLOPEZ.24@yahoo.com, rlopez4insurance@gmail.com, service@firstfamilyins.com

To Whom it May Concern,

My name is Jason Crews.  I write regarding a telemarketing concern of mine. On **December 9, 2023,** I received unsolicited phone calls to my cell phone, (602) 295-1875, which appears to be from your organization or from an organization calling on your behalf, and is prohibited by According to the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C.§ 227, without my express written consent.

I did not provide my consent to your company to make telemarketing calls.  My telephone number, (602) 295-1875, is on the National Do-Not-Call registry. According to the TCPA it is illegal to make marketing calls to individuals on the Do-not-call registry without the consent of the recipient.  Furthermore, the calls were sent using an automatic telephone dialing system ("ATDS"), and were pre recorded, both of which are prohibited by the TCPA without my express written consent.

Please forward to my attention all documents that evidence pertaining to any purported consent to receive telemarketing calls and/or text messages from you and/or your company. Additionally, please place my telephone number (602) 295-1875 on your internal Do-Not-Call list and provide a copy of your Do-Not-Call policy.

Before I proceed with a formal claim, I wanted to give you the opportunity to explain its actions.  **Please forward this information to my attention by email (jason.crews@gmail.com) by December 16, 2023.**

**Please take this as formal notice of my intent to sue, and you are hereby required to preserve all information and evidence pertaining to this matter.  That included, but is not limited to, records, notes,  and recordings of calls.**

Jason Crews

---

**4 attachments**

  **Screenshot_20231209_095426_Messages.jpg**
726K



  **Screenshot_20231209_095419_Messages.jpg**
261K



**Screenshot_20231209_095540_Messages.jpg**
435K

 **phone_20231209-093806__18605174558.amr**
1506K

---

**Mail Delivery Subsystem** <mailer-daemon@googlemail.com>        Sat, Dec 9, 2023 at 11:00 AM
To: jason.crews@gmail.com

## Address not found

Your message wasn't delivered to **service@firstfamilyins.com**
because the address couldn't be found, or is unable to receive
mail.

The response from the remote server was:

550 #5.1.0 Address rejected.

Final-Recipient: rfc822; service@firstfamilyins.com
Action: failed
Status: 4.4.2
Remote-MTA: dns; mail30.corpmailsvcs.com. (149.111.205.65, the server for the
domain firstfamilyins.com.)
Diagnostic-Code: smtp; 550 #5.1.0 Address rejected.
Last-Attempt-Date: Sat, 09 Dec 2023 10:00:40 -0800 (PST)

---------- Forwarded message ----------
From: Jason Crews <jason.crews@gmail.com>
To: RLOPEZ.24@yahoo.com, rlopez4insurance@gmail.com, service@firstfamilyins.com
Cc:
Bcc:
Date: Sat, 09 Dec 2023 18:00:29 +0000
Subject:
----- Message truncated -----

---

**Jason Crews** <jason.crews@gmail.com>        Sat, Dec 9, 2023 at 11:09 AM
To: mLaughlin@firstfamilyinsurance.com, RLOPEZ.24@yahoo.com, rlopez4insurance@gmail.com

[Quoted text hidden]

---

**4 attachments**



**Screenshot_20231209_095426_Messages.jpg**
726K



**Screenshot_20231209_095419_Messages.jpg**
261K



**Screenshot_20231209_095540_Messages.jpg**
435K



**phone_20231209-093806__18605174558.amr**
1506K

**Email Delivery Certificate generated by Mailtrack**

| | |
|---|---|
| **From** | Jason Crews <jason.crews@gmail.com> |
| **Subject** | |
| **Message ID** | <d9e4282a-b297-357f-dc29-b020f729a748@gmail.com> |
| **Delivered on** | 9 Dec, 2023 at 11:00 AM |
| **Delivered to** | <RLOPEZ.24@yahoo.com>, <rlopez4insurance@gmail.com>, <service@firstfamilyins.com> |

**Tracking history**

👁 **Opened** on 6 May, 2024 at 7:11 AM by rlopez4insurance@gmail.com

👁 **Opened** on 29 Apr, 2024 at 11:28 AM by rlopez4insurance@gmail.com

👁 **Opened** on 29 Apr, 2024 at 11:19 AM by rlopez4insurance@gmail.com

👁 **Opened** on 29 Apr, 2024 at 11:19 AM by rlopez4insurance@gmail.com

👁 **Opened** on 29 Apr, 2024 at 10:46 AM by rlopez4insurance@gmail.com

👁 **Opened** on 29 Apr, 2024 at 10:46 AM by rlopez4insurance@gmail.com

👁 **Opened** on 26 Apr, 2024 at 5:38 AM by rlopez4insurance@gmail.com

👁 **Opened** on 26 Apr, 2024 at 5:38 AM by rlopez4insurance@gmail.com

👁 **Opened** on 25 Apr, 2024 at 1:25 PM by rlopez4insurance@gmail.com

👁 **Opened** on 10 Apr, 2024 at 2:49 PM by rlopez4insurance@gmail.com

👁 **Opened** on 14 Mar, 2024 at 6:47 PM by rlopez4insurance@gmail.com

👁 **Opened** on 14 Mar, 2024 at 6:41 PM by rlopez4insurance@gmail.com

👁 **Opened** on 14 Mar, 2024 at 6:24 PM by rlopez4insurance@gmail.com

👁 **Opened** on 14 Mar, 2024 at 12:34 PM by rlopez4insurance@gmail.com

👁 **Opened** on 14 Mar, 2024 at 11:56 AM by rlopez4insurance@gmail.com

👁 **Opened** on 14 Mar, 2024 at 11:25 AM by rlopez4insurance@gmail.com

👁 **Opened** on 14 Mar, 2024 at 11:25 AM by rlopez4insurance@gmail.com

👁 **Opened** on 14 Mar, 2024 at 11:22 AM by rlopez4insurance@gmail.com

👁 **Opened** on 14 Mar, 2024 at 11:22 AM by rlopez4insurance@gmail.com

 **mailtrack**

2024 © **The Mail Track Company, S.L.**
C/ Córcega 301, At. 2.
08008 Barcelona - España

**Email Delivery Certificate generated by Mailtrack**

👁 **Opened** on 14 Mar, 2024 at 11:03 AM by rlopez4insurance@gmail.com

👁 **Opened** on 14 Mar, 2024 at 10:01 AM by rlopez4insurance@gmail.com

👁 **Opened** on 14 Mar, 2024 at 9:55 AM by rlopez4insurance@gmail.com

👁 **Opened** on 14 Mar, 2024 at 9:40 AM by rlopez4insurance@gmail.com

👁 **Opened** on 14 Mar, 2024 at 9:40 AM by rlopez4insurance@gmail.com

👁 **Opened** on 14 Mar, 2024 at 8:07 AM by rlopez4insurance@gmail.com

👁 **Opened** on 14 Mar, 2024 at 8:07 AM by rlopez4insurance@gmail.com

👁 **Opened** on 13 Mar, 2024 at 2:00 PM by rlopez4insurance@gmail.com

👁 **Opened** on 13 Mar, 2024 at 6:59 AM by rlopez4insurance@gmail.com

👁 **Opened** on 13 Mar, 2024 at 6:59 AM by rlopez4insurance@gmail.com

👁 **Opened** on 12 Mar, 2024 at 2:11 PM by rlopez4insurance@gmail.com

👁 **Opened** on 12 Mar, 2024 at 2:11 PM by rlopez4insurance@gmail.com

👁 **Opened** on 12 Mar, 2024 at 2:05 PM by rlopez4insurance@gmail.com

👁 **Opened** on 12 Mar, 2024 at 2:05 PM by rlopez4insurance@gmail.com

👁 **Opened** on 12 Mar, 2024 at 2:05 PM by rlopez4insurance@gmail.com

👁 **Opened** on 12 Mar, 2024 at 1:50 PM by rlopez4insurance@gmail.com

👁 **Opened** on 12 Mar, 2024 at 1:50 PM by rlopez4insurance@gmail.com

👁 **Opened** on 12 Mar, 2024 at 11:30 AM by rlopez4insurance@gmail.com

👁 **Opened** on 12 Mar, 2024 at 11:24 AM by rlopez4insurance@gmail.com

👁 **Opened** on 12 Mar, 2024 at 11:24 AM by rlopez4insurance@gmail.com

👁 **Opened** on 12 Mar, 2024 at 10:55 AM by rlopez4insurance@gmail.com

👁 **Opened** on 12 Mar, 2024 at 10:55 AM by rlopez4insurance@gmail.com

👁 **Opened** on 12 Mar, 2024 at 10:53 AM by rlopez4insurance@gmail.com

👁 **Opened** on 12 Mar, 2024 at 10:11 AM by rlopez4insurance@gmail.com

👁 **Opened** on 12 Mar, 2024 at 10:09 AM by rlopez4insurance@gmail.com

👁 **Opened** on 6 Mar, 2024 at 6:14 PM by rlopez4insurance@gmail.com



2024 © **The Mail Track Company, S.L.**
C/ Córcega 301, At. 2.
08008 Barcelona - España

👁 **Opened** on 5 Mar, 2024 at 6:37 AM by rlopez4insurance@gmail.com

👁 **Opened** on 5 Mar, 2024 at 6:31 AM by rlopez4insurance@gmail.com

👁 **Opened** on 5 Mar, 2024 at 6:30 AM by rlopez4insurance@gmail.com

👁 **Opened** on 5 Mar, 2024 at 6:26 AM by rlopez4insurance@gmail.com

👁 **Opened** on 9 Dec, 2023 at 6:08 PM by RLOPEZ.24@yahoo.com

mailtrack

2024 © **The Mail Track Company, S.L.**
C/ Córcega 301, At. 2.
08008 Barcelona - España